1
2
3
4
5
6
7
8
9        **UNITED STATES DISTRICT COURT**
10       **SOUTHERN DISTRICT OF CALIFORNIA**
11
12   ELWOOD TIMOTHY WHITE,              NO. 13-CV-1166-MMA(RBB)
     Individually, and as Successor-In-
13   Interest to the Estate of Elwood       **ORDER GRANTING IN PART**
     Edwards White, and DARLEEN            **AND DENYING IN PART**
14   EDWARDS WHITE,                        **DEFENDANTS' MOTION FOR**
                                           **SUMMARY JUDGMENT**
15                          Plaintiffs,
16         v.                             [Doc. No. 42]
17   COUNTY OF SAN DIEGO and
     DEPUTY MICHAEL ASTORGA,
18
                           Defendants.
19
20         Plaintiffs Elwood Timothy White and Darlene Edwards White (collectively,
21   "Plaintiffs") have filed this civil rights action in the aftermath of the fatal shooting of
22   their son, Elwood Edwards White, by Defendant Michael Astorga, a Deputy Sheriff
23   of the San Diego County Sheriff's Department.  Defendants County of San Diego
24   and Astorga (collectively, "Defendants") move for summary judgment pursuant to
25   Federal Rule of Civil Procedure 56.  The Court found the matter suitable for
26   determination on the papers and without oral argument pursuant to Civil Local Rule
27   7.1(d)(1).  For the reasons set forth below, the Court **GRANTS IN PART** and
28   **DENIES IN PART** Defendants' motion for summary judgment.

                                        1

## BACKGROUND[1]

### A. Factual Background

On May 20, 2012, Elwood Edwards White ("White"), a twenty-two year old black male, was visiting friends in Vista, California. A friend observed White filling his pockets with gravel and rocks, walking in circles, and talking to himself. White physically assaulted his friend, screamed unintelligible words, and then ran off down the street. At 12:55 p.m., the friend's mother called 911 to report the incident.

Around 1:23 p.m., White walked toward the four-way intersection of Oceanside Boulevard and North Melrose Drive, carrying a twenty-pound cinderblock in his hands. A vehicle was stopped at the intersection. As White approached the vehicle, he threw the cinderblock through the window of the passenger side, striking and injuring the passenger in the chest. White then yelled "Got a problem?!" and "What's up!" and ran toward the Arco AM/PM on the southwest corner of the intersection. The incident was transmitted through the police broadcasting system as an assault with a deadly weapon.

As White ran toward the gas station, he pulled rocks out of his pockets and threw them indiscriminately at nearby vehicles. As he arrived at the Arco, White continued throwing rocks from his pockets, breaking the store's front window. White then knocked down display racks throughout the store, causing two Arco employees in the store to lock themselves in the bathroom for safety. As he exited the store, a vehicle pulled into the parking lot. White then jumped on the roof of the vehicle.

Next, White ran westbound on Oceanside Boulevard, continuing to throw rocks at passing cars. A passing truck was hit by one of the rocks and pulled over to

---

[1] The facts cited herein are not reasonably in dispute unless noted otherwise. To the extent a fact is in dispute, it is construed in the light most favorable to Plaintiffs. *See Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007); *Evans v. City of San Diego*, 913 F. Supp. 2d 986, 998 n.1 (S.D. Cal. 2012).

the curb. Two males, who were later identified as Marines, jumped out of the truck and ran after White. White and the two men got into a fist fight on the sidewalk. As the altercation ensued, an Oceanside parking enforcement truck pulled over to the curb. White ran over to the truck and pulled a large push broom from the bed of the parking enforcement truck. As he ran back toward the two men, White swung the broom, striking one of the men. The head of the broom broke off, creating a 4-foot, 3-inch long broom handle with a sharp, jagged edge on one end.

At this point, various cars had pulled over to the curb of the north side of the road, including that of Steven and Roseanne Daniel. Upon seeing the ongoing altercation between White and the two men, Mr. Daniel exited his car and walked toward the altercation, hoping to calm the situation. White then turned and ran toward Mr. Daniel holding the broom stick out straight in front. White repeatedly shouted "Get out of my way, or help me!" As White approached Mr. Daniel, he held the broom stick like a bat and swung at Mr. Daniel but missed.

White then ran past Mr. Daniel, heading toward Mr. Daniel's van that was parked on the curb. Mrs. Daniel, who was standing outside the passenger's side door, jumped back into the van and shut the door. White held the broom handle above his right shoulder and began striking the passenger side door. Still inside the van, Mrs. Daniel called 911 and was told that officers were on the scene.

Five officers—Sheriff Deputies Michael Astorga, Jason Burk, and Asami Minami along with Oceanside Police Officers McCutceon and Markham— arrived at the scene.[2] The precise details of what happened next and in what order are not entirely clear. Concerned for Mrs. Daniel's safety, Deputy Minami announced the presence of his canine partner and approached the driver's side of the van. He then ordered White to drop the broom handle. Astorga drew his taser. Burk,

_____

[2] In their statement of facts, Defendants represent that the officers arrived on scene at or around the same time. However, it appears from the record that Officer Markham arrived only 7 seconds prior to the shooting.

McClutcheon, and Markham drew their handguns.

White turned around and walked east, holding the broom handle over his right shoulder. He then stopped on the sidewalk near the police car and faced the officers. Directly behind White was a high, chain link fence that extended in both directions. Various officers yelled at White to drop the broom handle. At some point, Deputy Minimi yelled "less lethal" and to "grab the beanbag." At another point, Astorga holstered his taser and drew his firearm.

Still holding the 4-foot, 3-inch broom handle with two hands like a bat, White moved off the sidewalk and into the street and focused in on Deputy Burk, who was positioned at the front driver's side corner of a police vehicle. Located to the west of Burk were McCutcheon, Astorga, Minami, and Markham in that order. As White took one step toward Deputy Burk, he began yelling "in the name of Jesus Christ" and other unintelligible words. At that moment, Deputy Astorga fired a single shot from his Glock 22 pistol at White, penetrating White in the chest.

Less than 2 minutes elapsed from the time the officers arrived on scene to when Astorga discharged his gun.

### B.    Procedural Background

Plaintiffs, individually and in their capacity as successor-in-interest to White's estate, filed a complaint against Defendants County of San Diego, Astorga, and the City of Oceanside[3] alleging claims for excessive force under 42 U.S.C. § 1983,[4]

---

[3] Defendant City of Oceanside filed an answer to Plaintiffs' Complaint. *See* Doc. No. 6. The parties subsequently jointly moved for dismissal of Defendant City of Oceanside without prejudice, which the Court granted. *See* Doc. Nos. 34, 35. Because the City of Oceanside has been dismissed, the Court discusses the procedural history as to the two remaining Defendants only.

[4] "Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). "To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012). The parties do not dispute the state actor prong.

discrimination and civil rights claims in violation of California Civil Code sections 51.7 and 52.1(b),(h), assault and battery, wrongful death, negligent training, and negligence. *See* Doc. No. 1.

Defendant County of San Diego moved to dismiss various claims, which the Court granted in part and denied in part. The Court dismissed Plaintiffs' *Monell* claim and civil rights claim under California Civil Code section 57.1 against the County of San Diego with leave to amend. The Court also dismissed Plaintiffs' claims for negligent training in violation of California Government Code section 815.2(a) and California Civil Code section 52.1 against the County as unopposed and without leave to amend. Finally, the Court granted the County's motion to strike any reference to White's pre-death pain and suffering. *See* Doc. No. 12.

Plaintiffs then filed a First Amended Complaint alleging claims for excessive force under 42 U.S.C. § 1983; discrimination and civil rights violations under California Civil Code sections 51.7; as well as wrongful death, assault and battery, and negligence in violation of California Government Code section 815.2(a). *See* Doc. No. 13. Defendants County of San Diego and Astorga moved to dismiss and to strike portions of the First Amended Complaint. *See* Doc. No. 14. Based on Plaintiffs' non-opposition [Doc. No. 18], the Court granted the motion and dismissed without prejudice Plaintiffs' claims for violations of 42 U.S.C. § 1983 against the County and Plaintiffs' claims for violations of California Civil Code section 51.7 against all defendants. The Court also struck certain references from the First Amended Complaint. *See* Doc. No. 22 at 8. Accordingly, Plaintiffs' only remaining claims from the operative First Amended Complaint are as follows: violation of 42 U.S.C. § 1983 (against Deputy Astorga only), and wrongful death, assault and battery, and negligence under California Government Code section 815.2(a) against Defendants County of San Diego and Astorga.

Defendants now move for summary judgment in their favor as to all of Plaintiffs' remaining claims.

13cv1166-MMA(RBB)

1

**LEGAL STANDARD**

2      A motion for summary judgment should be granted if there is no genuine

3 issue of material fact and the moving party is entitled to judgment as a matter of law.

4 Fed. R. Civ. P. 56(a).  The purpose of summary judgment "is to isolate and dispose

5 of factually unsupported claims or defenses."  *Celotex v. Catrett*, 477 U.S. 317,

6 323–24 (1986).  The moving party bears the initial burden of informing the court of

7 the basis for the motion, and identifying portions of the pleadings, depositions,

8 answers to interrogatories, admissions, or affidavits that demonstrate the absence of

9 a triable issue of material fact.  *Id.* at 323.  The evidence and all reasonable

10 inferences therefrom must be viewed in the light most favorable to the non-moving

11 party.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31

12 (9th Cir. 1987).

13      If the moving party meets its initial burden, the burden then shifts to the non-

14 moving party to present specific facts showing that there is a genuine issue of

15 material fact for trial.  *Celotex*, 477 U.S. at 324.  The opposing party "must do more

16 than simply show that there is some metaphysical doubt as to the material facts."

17 *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).  When a

18 party fails to properly address another party's assertions of fact, a court may

19 consider those facts as undisputed.  Fed. R. Civ. P. 56(e)(2).  If the motion and

20 supporting materials, including facts considered undisputed, show the movant is

21 entitled to summary judgment, the court may grant the motion.  Fed. R. Civ. P.

22 56(e)(3).  Summary judgment is not appropriate, however, if the non-moving party

23 presents evidence from which a reasonable jury could resolve the disputed issue of

24 material fact in his or her favor.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248

25 (1986); *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991).

26      "Credibility determinations, the weighing of the evidence, and the drawing of

27 legitimate inferences from the facts are jury functions, not those of a judge."

28 *Anderson*, 477 U.S. at 255.  "The evidence of the non-movant is to be believed, and

1  all justifiable inferences are to be drawn in his favor." *Id.*; *see also Demers v.*

2  *Austin*, 729 F.3d 1011, 1017 (9th Cir. 2013).  Accordingly, "[s]ummary judgment is

3  not appropriate if a reasonable jury viewing the summary judgment record could

4  find by a preponderance of the evidence that the [non-moving party] is entitled to a

5  favorable verdict." *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

6  **DISCUSSION**[5]

7      Defendants move for summary judgment on Plaintiffs' claims for excessive

8  force under the Fourth Amendment, deprivation of familial relations under the

9  Fourteenth Amendment, related state law claims, and punitive damages.

10 *A.    Excessive Force against Defendant Astorga and Qualified Immunity*

11     Defendants move for summary judgment on Plaintiffs' claim for excessive

12 force on two grounds.  First, Defendants assert that there is no triable issue of

13

14

15

---

16     [5] As an initial matter, both parties have filed evidentiary objections.  Plaintiffs
   object to deposition testimony of Deputy Burk, Officer Markham, and Officer
17 McCutcheon as lacking foundation, hearsay, and speculation.  Defendants object to
   almost all of Plaintiffs' additional statements of undisputed facts as irrelevant, lacking
18 foundation, argumentative, and speculation.  *See* Reply at 5–7.  Upon considering the
   objections in detail, the Court finds the evidence is admissible at summary judgment.
19  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or
   dispute a fact cannot be presented in a form that would be admissible in evidence."); *see*
20 *also Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001).
        Only one objection warrants further discussion.  Plaintiffs object to any testimony
21 as to what the officers heard over the radio dispatch regarding events preceding Mr.
   White's death—that White had broken the AM/PM front window and ransacked the
22 store, that he was jumping on top of cars and throwing rocks, that he threw a cinder
   block through a window of a vehicle—as hearsay and lacking personal knowledge of
23 the underlying events.  However, the radio dispatches are not being offered for the truth
   of the matter asserted—i.e. whether White was, in fact, the person purportedly jumping
24 on top of cars and throwing rocks.  The dispatches therefore do not constitute hearsay.
   *See* Fed. R. Evid. 801(c); *see United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir.
25 1991).  Instead, the radio dispatches are being offered to demonstrate their effect on the
   listener—what the officer heard and thus knew of White's conduct when he responded
26 to the call.  *See, e.g.*, *Dayton v. Sears Roebuck & Co.*, No. 12-1945, 2014 WL 5797172,
   at *5 (E.D. Cal. Nov. 6, 2014) (finding statements introduced to explain their effect on
27 the listener are not hearsay).  Accordingly, the Court finds the officers' testimony
   regarding the radio dispatches is admissible at this stage of the litigation. The Court
28 therefore **OVERRULES** the parties' evidentiary objections in their entirety.

7

material fact regarding whether Defendant Astorga's use of deadly force[6] was objectively reasonable.  Second, Defendants assert that even if a factual issue exists regarding Defendant Astorga's use of force, he is otherwise entitled to qualified immunity because his use of force was not clearly unlawful.  Plaintiffs contend that material issues of fact exist regarding whether Astorga's force was excessive, thereby precluding summary judgment.

### 1. Excessive Force

Courts analyze claims of excessive force, including deadly force, under the Fourth Amendment's objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see Acosta v. Hill*, 504 F.3d 1323, 1324 (9th Cir. 2007) ("[T]here is no special Fourth Amendment standard for unconstitutional deadly force.") (internal citation omitted).  The relevant inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.  This inquiry requires courts to weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citation and internal quotation marks omitted).  In other words, courts must "balance the amount of force applied against the need for that force." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003).

"An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014), *cert. denied sub nom. Wyatt v. F.E.V.*, – S. Ct. –, 2014 WL 3795998 (Nov. 17, 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir.

---

[6]Astorga fired a single shot from his Glock 22 pistol, which struck White in the chest and killed him.  Thus, only lethal force is at issue. *See Bryan v. MacPherson*, 630 F.3d 805, 825 n.6 (9th Cir. 2010) (defining "lethal force" as force that creates a substantial risk of death or serious bodily injury) (citing *Smith v. City of Hemet*, 394 F.3d 689, 705–07 (9th Cir. 2005) (en banc)).

13cv1166-MMA (RBB)

1994)) (internal quotation marks omitted).  To assess whether the use of force was objectively reasonable, courts consider various factors including "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape."  *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012) (quoting *Graham*, 490 U.S. at 396).  "The immediacy of the threat posed by the suspect is the most important factor."  *Gonzalez*, 747 F.3d at 793 (citation omitted).  The three factors listed above, however, are not exclusive, and the Ninth Circuit has instructed courts to consider the totality of the circumstances.  *Bryan*, 630 F.3d at 826.  In doing so, courts may also consider "[o]ther relevant factors includ[ing] the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."  *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011).

Importantly, courts determine reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.  However, "it is equally true that even where some force is justified, the amount actually used may be excessive."  *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (internal citation and quotation omitted).  Because the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  *Id.* at 853.

Finally, deadly force cases often pose unique problems because the officer defendant is often the only surviving witness, and therefore "the witness most likely

to contradict his story—the person shot dead—is unable to testify."[7] *Scott*, 39 F.3d at 915; *see also Gonzalez*, 747 F.3d at 795. In light of this problem, "[t]he judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Scott*, 39 F.3d at 915. "In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.*

The Court considers the various factors of the excessive force inquiry in turn. First, the Court considers the severity of the crime at issue. *See Graham*, 490 U.S. at 396. Here, the officers responded to a call describing an assault with a deadly weapon. Further, at the time they responded, the officers were aware that a suspect who they believed to be White had thrown a cinderblock through a vehicle's window, injuring the vehicle's passenger, and ransacked the AM/PM market. The officers, including Astorga, were also aware that White had put rocks in his pockets and was throwing them at cars in what appeared to be a random, indiscriminate manner. Thus, the parties do not dispute that the officers, including Astorga, responded to a serious situation in which they anticipated White was involved in an assault with a deadly weapon resulting in an injury.

Second, the Court considers whether White posed an immediate threat to the safety of the officers or others. *See Graham*, 490 U.S. at 396. As noted above, this is "most important factor" of the excessive force inquiry. *See Gonzalez*, 747 F.3d at 793. When Deputy Astorga arrived on scene, White was holding a 4-foot, 3-inch long broom handle with a sharp, jagged edge on one end. White was slapping the

---

[7] The Court finds this directive applicable to the instant case, even though the officers are not the only surviving witnesses. As noted throughout the Court's analysis below, the officers' accounts at times are internally inconsistent on material issues.

side of a bystander's van with the handle while one passenger was still inside.[8]
Upon the officers' arriving at the scene and deploying their weapons—Minami used
his police dog to approach the van, Astorga initially drew a taser, and Burk,
McCutcheon, and Markham immediately drew their handguns—White then moved
away from the van and onto the sidewalk.  The officers then commanded any
bystanders to move away.  Thus, at that point, White stood on the sidewalk, still
holding the stick with both hands above his right shoulder, facing the road where the
5 officers and their patrol cars were located.  On the other side of the sidewalk
located directly behind White was a chain link fence approximately 10- to 12- feet
high that extended in both directions.[9]  Various officers yelled for White to drop his
weapon.  At some point during the encounter, Astorga heard Deputy Minami yell out
"less lethal" and "to grab the beanbag."  At another point, Astorga holstered his taser
and drew his gun.  With 5 officers on scene—4 had their guns drawn with 3 pointing
directly at White—White then purportedly stepped off the sidewalk and into the
street.  Astorga fired his gun, striking White in the chest.

Defendants claim that Astorga fired his weapon because he perceived White
to be an immediate threat of serious bodily injury or death to Deputy Burk.[10]
"However, a simple statement by an officer that he fears for his safety or the safety
of others is not enough; there must be objective factors to justify such a concern."
*Deorle*, 272 F.3d at 1281.  The crux of Defendants' argument is that at the moment

---

[8] Based on Astorga's own account of the incident, he arrived on scene at this point and therefore did not witness or observe any of White's behavior preceding this, including his altercation with the two men or swinging at and missing Mr. Daniel.

[9]  The parties dispute the exact height of the fence but do not dispute that the fence extended in both directions.

[10]  The Court notes that there is some inconsistency as to who exactly was in immediate danger.  Defendants assert that Astorga also perceived an immediate threat to nearby civilians and that Astorga thought White was going to run toward the civilians, hurt them, and kill them, or take them hostage.  However, other evidence in the record suggests that White was standing closest to Deputy Burk, and any civilians present at the scene had previously moved away from White pursuant to the officers' commands to do so.

White stepped into the road, he was within 3 to 5 feet of Deputy Burk and therefore close enough to strike and attack Burk with the 4-foot, 3-inch broom handle.  Thus, based on Defendants' own reasoning, White's precise location—or how close or far away he was standing from Burk—is crucial to assessing whether White posed an immediate threat to Burk's safety.  Defendants estimate that White was somewhere between 3 and 5 feet away from Burk at the time of the shooting.[11]  However, based on Burk's own account of the incident, White was still 8 feet or so away[12] from him at the time Astorga shot White.  Viewing this fact in the light most favorable to Plaintiffs, a reasonable jury could find that by being 8 feet away, Deputy Burk was not within White's striking distance, and thus, White was not an "immediate threat" to Deputy Burk's safety warranting the use of deadly force.

Further, at the time of the shooting, White was not swinging or jabbing the stick in any direction, but was holding it with both hands above his right shoulder and moving it back and forth slightly with his wrists.[13]  According to one officer, the stick was not even fully extended.  Although various officers commanded White to "drop the stick" and "drop the weapon" at least twice during the officers' 1½- to- 2-minute encounter with White, White did not comply.  However, White continued to hold the stick with both hands, so the officers could see White's hands at all times, and White did not swing the stick in any direction.  Further, there is nothing in the record to suggest that Astorga or the other officers suspected that White had a gun or

---

[11] Astorga estimated that White was 5 feet away from Burk at the time he fired his weapon, and Mr. Daniel estimated White was with 3 to 5 feet from the officers, without specifying which officer.

[12] Mr Douglas:     When he was shot, you say he was on the other side of Astorga's patrol car? The width --
Deputy Burk:    Just the reference I used.
Mr. Douglas:    That was the eight-foot or so reference, is that the distance that he was from you?
Deputy Burk:    That's correct.
Mr. Douglas:    When he was shot, he was facing you?
Deputy Burk:    Yes.

[13] One officer likened this movement to "wiggling the bat" in baseball.

13cv1166-MMA (RBB)

1    other hidden weapon.[14]  At no point did White verbally threaten to attack the

2    officers, and there is some inconsistency as to whether White advanced toward

3    Deputy Burk or simply stepped off the sidewalk toward the roadway.[15]  *See Glenn*,

4    673 F.3d at 873.  Finally, at the time of the shooting, there were 5 law enforcement

5    officers on scene with 3 guns trained directly on White.  Viewing these facts in the

6    light most favorable to Plaintiffs, a reasonable jury could conclude that White did

7    not pose an "immediate threat" to Burk that necessitated the use of deadly force.

8         Third, the Court considers whether White actively resisted arrest or attempted

9    to escape.  *See Graham*, 490 U.S. at 396.  Defendants do not argue, and there is

10   nothing in the record to suggest, that White attempted to escape.  Moreover, because

11   of the chain link fence located directly behind White, the officers essentially had

12   White cornered between them and the fence.  Thus, as Plaintiffs correctly point out,

13   White posed no threat of escaping.  However, whether White was "actively resisting

14   arrest" is less clear.  *See Glenn*, 673 F.3d at 875.  As the Ninth Circuit has

15   recognized, "[r]esistance . . . should not be understood as a binary state, with

16   resistance being either completely passive or active.  Rather, it runs the gamut from

17   the purely passive protestor who simply refuses to stand, to the individual who is

18   physically assaulting the officer."  *Bryan*, 630 F.3d at 830.  Here, various officers

19   yelled for White to "drop the weapon" and to "drop the stick," and it is undisputed

20   that White did not comply with the officers' commands.  However, in response to

21

22        [14] To the contrary, Deputy Burk testified that based on White's attire—White was
23   wearing gym shorts and had already removed his sweatshirt—he did not think White
     had a hidden weapon.

24        [15] Mr. Douglas:        Did Mr. White present a threat to one officer or to more than
                                   one?
25        Deputy Minami:          I do not know.
          Mr. Douglas:            Did  the office who was threatened by Mr. White shoot him?
26        Deputy Minami:          I do not know.  I just know he was advancing toward the
                                   roadway.
27        Mr. Douglas:            Do you know if he was advancing toward any particular
                                   person when he got shot?  "Do you know," is the question.
28        Deputy Minami:          No, I don't.

the officers' commands to drop the stick, White yelled "In the name of Jesus Christ!" and other unintelligible utterances.  Based on his response, a jury could question whether White even understood the officers' commands.  Moreover, although White did not comply by dropping the stick, he also did not actively resist by assaulting or threatening to assault the officers.  *See Glenn*, 673 F.3d at 875 (distinguishing the refusal to follow officers' commands from actively attacking or threatening the officers or others).

Another consideration is whether it should have been apparent to the officers that White may have been emotionally disturbed.  *See Deorle*, 272 F.3d at 1283; *Glenn*, 673 F.3d at 875.  The Ninth Circuit has expressly recognized that "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle*, 272 F.3d at 1283.  Plaintiffs contends that on the day of the shooting, White suffered a psychological breakdown, as evidenced by his strange behavior—babbling incoherently, stuffing his pockets full of rocks, throwing rocks indiscriminately at cars and people, and not complying with the officers' commands to drop the broom handle when faced with numerous guns pointed directly at him—all behaviors which Astorga either became aware of prior to responding or observed first-hand at the scene.[16]  Plaintiffs' expert, Jack Smith,[17] opines that upon

---

[16] Defendants highlight the fact that White's parents were unaware of his having a diagnosed mental illness or receiving mental health treatment.  However, this is irrelevant to the excessive force inquiry.  At the time of the incident, there is nothing in the record to suggest Astorga knew this or any other information about White's mental health.  *See Glenn*, 673 F.3d at 873 n.8 (noting the court "cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways") (internal citation omitted).

[17] Mr. Smith served as Captain of Police for the Los Angeles Police Department, Chief of Police for the City of El Cajon, and Assistant Sheriff for the San Diego County Sheriff's Department.

observing these behaviors, a reasonable law enforcement officer should recognize the possibility that the suspect is suffering from some sort of mental or emotional disturbance.  Indeed, Astorga described White's behavior as "bizarre," recognized the possibility that he was suffering from some sort of mental illness, and assumed White was "crazy."  Viewing these facts in the light most favorable to Plaintiffs, a jury could determine that White was suffering from an emotional disturbance of some sort, which would necessarily weigh against the government's interest in using force.  *See Deorle*, 272 F.3d at 1283.

The Court also considers whether the officers gave White a proper warning before employing deadly force.  *See Glenn*, 673 F.3d at 875.  The Ninth Circuit has recognized "that an officer must give a warning before using deadly force 'whenever practicable.'" *Gonzalez*, 747 F.3d at 794 (citing *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997)); *see also Deorle*, 272 F.3d at 1284 ("Appropriate warnings comport with actual police practice. . . [and] such warnings should be given, when feasible, if the use of force may result in serious injury.").  Here, various officers ordered White to drop the handle.  Deputy Minami also yelled "less lethal" and to "grab the beanbag," although none of the officers responded to his command.  At no point, however, did Astorga warn White that he would shoot if White failed to put down the broom handle.[18]  Although such a warning may or may not have caused White to lower the broom handle in compliance, a jury could reasonably determine "there was ample time to give that order or warning and no reason whatsoever not to do so." *Bryan*, 630 F.3d at 831; *see also Gonzalez*, 747 F.3d at 797 ("A rational jury may find . . . a warning was practicable and the failure to give one might weigh against reasonableness.").

Finally, the Court considers whether there were less intrusive means available

---

[18] In their motion, Defendants assert that White was "warned that he may be shot if he did not submit and disarm." *See* Doc. No. 42 at 16.  Defendants do not cite any particular evidence for this proposition, and there is nothing in the record before the Court to support a finding that Astorga, or any other officer, gave White a warning that he would be shot if he did not put down the handle.

to Astorga than deadly force.  "Officers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."  *Glenn*, 673 F.3d at 876 (internal citations and quotations omitted).  Officers, however, "must *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a factor to include in our analysis."  *Bryan*, 630 F.3d at 831 n.15 (emphasis in original).  Here, the parties do not dispute that Astorga had access to a taser, which he initially drew before switching to his gun, and that Deputy Minami had his canine partner on scene.  Additionally, prior to shooting his gun, Astorga heard Minami yell "less-lethal" and "to grab the beanbag," which was located in one of the patrol cars.  None of the officers attempted to use these alternatives before Astorga shot White.  According to Defendants, none of these methods were feasible alternatives on the day in question because of the wind and the threat White posed to the dog and officers.

Plaintiffs assert that these less-than-lethal alternatives should have been attempted prior to using deadly force, including the "swarm" technique, deploying the canine officer that was present, or using other non-lethal weapons such as a taser, pepper spray, or beanbag shotgun.  In support of this argument, Plaintiffs rely on the statements of expert Jack Smith, who opines the officers should have considered that White may have been suffering from some mental or emotional disturbance and attempted to slow down the incident, if possible, by appointing one officer to give White commands.  If that did not work, the officers could then use the police dog, taser, or other non-deadly force such as the beanbag gun.  Further, the expert report notes that the officers' encounter with White seemed "ideal" for use of the taser, or alternatively the use of the police dog, even after considering Defendants' purported reasons for not using them.  According to Plaintiffs' expert, "[t]he situation may have escalated to [the point where deadly force was necessary] but at the point the shot was fired, it was not at the point where deadly force was necessary especially

when they had less than lethal weapons that could have been just as effective present at hand." Doc. No. 44-2 at 113. Smith further opines that "an objectively reasonable officer, who has been appropriately trained, would recognize that the circumstances did present the ability to control [White] by less than lethal means." *Id.* at 76.

The Court finds that genuine issues of material fact exist as to whether alternative methods were indeed available. It is undisputed that Astorga himself had access to non-lethal alternatives, including a taser, and that a police dog was on scene. Though Defendants assert these alternatives were not feasible on the day in question, Plaintiffs have offered expert testimony to the contrary. *See Glenn*, 673 F.3d at 878 ("Although a jury could ultimately disagree that the officers were in optimal taser range or that use of a taser was otherwise feasible or preferable, these are disputed questions of fact."). Viewing the record in the light most favorable to Plaintiffs, a reasonable jury could determine that alternative means were, in fact, feasible, and such a finding may weigh against reasonableness. *See Gonzalez*, 747 F.3d at 797.

In sum, although White remained armed with a 4-foot, 3-inch long broom handle and did not comply with the officers' commands to drop the weapon, he posed no risk of flight given he was essentially cornered between the chain link fence and 5 armed officers. Further, a reasonable jury could find that Astorga should have considered whether White was suffering from some emotional disturbance at the time of the shooting and treated him accordingly. Finally, genuine issues of material fact exist as to the immediacy of the threat (i.e. precisely how close White was located to Deputy Burk at the time Astorga shot White), and whether less-lethal alternatives were in fact feasible. Upon balancing the above factors and construing the facts and inconsistencies in the record in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could find that Astorga's use of deadly force against White was not objectively reasonable. *See*

*Price v. Sery*, 513 F.3d 962, 972 (9th Cir. 2008) ("If a reasonable person could side with the plaintiff's interpretation of events, the issue must survive for trial.").

### 2.    Qualified Immunity

Defendants assert that even if a material factual dispute exists regarding Astorga's use of force against White, Astorga is nonetheless entitled to qualified immunity as a matter of law because his use of deadly force was not clearly unlawful.  "The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 905–06 (9th Cir. 2007) (internal citations omitted).  The purpose underlying this defense is "to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011).

To determine whether an officer is entitled to qualified immunity, the court must conduct a two-part inquiry.  First, the court considers whether the facts, taken in the light most favorable to the non-moving party, demonstrate that the officers' actions violated the plaintiff's constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151 (2001).  If so, the court must determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question.  *Mattos*, 661 F.3d at 440 (internal citation omitted).

First, as set forth in detail above, genuine issues of material fact exist regarding Astorga's shooting of White, specifically whether White indeed posed an "immediate threat" to Deputy Burk's safety, whether it should have been apparent to Astorga that White may have been suffering from some sort of emotional disturbance, and whether alternative, non-lethal means of force were feasible.  Upon

1   construing the facts in the light most favorable to Plaintiffs, a reasonable jury could

2   find that Astorga used an unreasonable or excessive amount of force against White

3   in shooting him, thereby violating White's Fourth Amendment rights.

4          Accordingly, whether Astorga is entitled to qualified immunity turns on the

5   second *Saucier* inquiry—whether White's right was clearly established.  "A right is

6   clearly established if a reasonable officer would know that his conduct was unlawful

7   in the situation he confronted."  *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d

8   528, 532 (9th Cir. 2010) (citing *Headwaters Forest Defense v. County of Humboldt*,

9   276 F.3d 1125, 1129 (9th Cir. 2002)).  As the Ninth Circuit has explained, "the test

10  is not simply a reiteration of the *Graham* test which we applied, above: rather, [the

11  court] must determine whether, in using excessive force, the officer made a

12  'reasonable mistake as to the legality of his actions.'"  *Deorle*, 272 F.3d at 1285

13  (quoting *Saucier,* 121 S.Ct. at 2158) (original alterations omitted).  In other words,

14  "the question is whether [the officer's] use of force was premised on a *reasonable*

15  belief that such force was lawful, or, as the Supreme Court recently put it: 'whether

16  it would be clear to a reasonable officer that his conduct was unlawful in the

17  situation he confronted.'"  *Id.* (quoting *Saucier,* 121 S.Ct. at 2156) (emphasis in

18  original).

19         Defendants assert that Astorga's conduct was not clearly unlawful because a

20  reasonable officer would believe that using deadly force was necessary to respond to

21  the immediate safety threat that White posed to Deputy Burk.[19]  Defendants further

22  contend that even if Astorga "mistakenly perceived the imminence of the threat to

23  Deputy Burk," he would still be entitled to qualified immunity.  As discussed in

---

24

25         [19]  According to Defendants, the fact that two other officers also had their guns
    drawn at White demonstrates Astorga's assessment of White as an immediate safety
26  threat was reasonable.  Defendants further assert that at some point throughout the
    encounter, these other officers contemplated firing their weapons.  However, Deputy
27  Burk also testified that he did not fire his weapon because the circumstances did not
    justify it.  This difference in opinion further supports the Court's conclusion that
28  genuine issues of material fact exist regarding whether a *reasonable* officer would
    believe White posed an immediate threat that warranted the use of deadly force.

detail above, triable issues of fact exist regarding whether the deadly force Astorga used against White was objectively reasonable in light of the circumstances. These unresolved issues include how far away White was standing from Deputy Burk when Astorga shot him, and thus whether White indeed posed an "immediate threat" to Deputy Burk's safety. The same issues of fact are material to determining whether a *reasonable* officer could believe—or be reasonably mistaken—that deadly force was lawful on the day in question. *See Espinosa,* 598 F.3d at 532 ("Those unresolved issues of fact are also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions."); *see also Santos*, 287 F.3d at 855 n.12 (finding the issue of qualified immunity was premature "because whether the officers may be said to have made a 'reasonable mistake' of fact or law . . . may depend on the jury's resolution of disputed facts and the inferences it draws therefrom. Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful."). Accordingly, the Court finds Astorga is not entitled to qualified immunity as a matter of law.

The Court finds genuine issues of material fact exist regarding whether Astorga's use of force in shooting White was objectively reasonable. The Court further finds that these unresolved issues of fact are also material to whether a reasonable officer could believe, or be reasonably mistaken, that the use of deadly force was lawful against White. Accordingly, Astorga is not entitled to qualified immunity as a matter of law. The Court therefore **DENIES** Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment excessive force claim.

### B.   *Fourteenth Amendment Claim against Deputy Astorga*

Defendants also move for summary judgment on Plaintiffs' Fourteenth Amendment claim for deprivation of familial relations, asserting there is no evidence to show that Deputy Astorga's actions were unrelated to a legitimate law

1    enforcement objective.  It is well settled that relatives may bring a claim on their

2    own behalf for deprivation of a familial relationship in violation their Fourteenth

3    Amendment substantive due process rights.  *See Gonzalez*, 747 F.3d at 797.

4    However, "[s]uch a claim requires the plaintiffs to prove that the officers' use of

5    force 'shock[ed] the conscience.'" *Id.* (quoting *Porter v. Osborn*, 546 F.3d 1131,

6    1137 (9th Cir. 2008)).  Here, Plaintiffs do not argue[20]—and there is nothing in the

7    record before the Court to suggest—that Astorga had a "purpose to harm" White or

8    any "ulterior motives" unrelated to a legitimate law enforcement objective for using

9    force against White.  *See Gonzalez*, 747 F.3d at 797–98 (finding summary judgment

10   appropriate where "plaintiffs produced no evidence that the officers had any ulterior

11   motives for using force against [the decedent]").  Thus, to the extent Plaintiffs bring

12   a Fourteenth Amendment claim for deprivation of familial relations, the Court

13   **GRANTS** summary judgment in favor of Defendants.

14   **C.     *State law claims against Deputy Astorga and County of San Diego***

15        Defendants also move for summary judgment on Plaintiffs' state law claims

16   for wrongful death, assault and battery, and negligence[21] against Deputy Astorga and

17   the County of San Diego on the grounds that Astorga's force was reasonable and

18   therefore privileged.  As both parties acknowledge, the same "objectively

19   reasonable" standard used to analyze excessive force claims under the Fourth

20   Amendment also applies to Plaintiffs' claims for wrongful death, assault and battery,

21   and negligence under California law.  *See Evans*, 913 F. Supp. 2d at 999; *see also*

22   *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) (en banc) ("Most of

23   the state law claims arise from the allegation that the individual officers used

24   excessive force, and California denies immunity to police officers who use excessive

25   _____

26        [20] Plaintiffs do not address this claim in their opposition.  *See* Doc. No. 43.

27        [21] Defendants also move for summary judgment on Plaintiffs' negligence claim
     on the ground that there is no liability for negligent investigation.  However, in their
28   opposition, Plaintiffs clarify that their negligence claim "is simply one for wrongful
     death based on negligence."  *See* Doc. No. 43 at 19.

1   force in arresting a suspect.").  As discussed in detail above, triable issues of fact

2   remain as to whether Astorga's use of force in shooting White was objectively

3   reasonable in light of the circumstances confronting him at the time.[22]  Because

4   Plaintiffs' state law claims flow from the same factual allegations of excessive force,

5   summary judgment is likewise inappropriate for the same reasons set forth above.

6   *See Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007) (finding that

7   because officers were not entitled to summary judgment on unlawful force claim

8   under § 1983, they were also not entitled to summary judgment on remaining state

9   law claims arising from the alleged use of force during plaintiff's arrest).  The Court

10  therefore **DENIES** Defendants' motion for summary judgment on Plaintiffs' claims

11  for wrongful death, assault and battery, and negligence under California law.

12  *D.     Punitive Damages*

13          Lastly, Defendants move for summary judgment as to liability for punitive

14  damages on the grounds that Plaintiffs have offered no evidence that Astorga's

15  conduct was motivated by evil motive or callous indifference.  Punitive damages

16  may be awarded where "the defendant's conduct that harmed the plaintiff was

17  malicious, oppressive or in reckless disregard of the plaintiff's rights."  *Dang v.*

18  *Cross*, 422 F.3d 800, 809 (9th Cir. 2005) (internal citation omitted).

19
20          Conduct is malicious if it is accompanied by ill will, or spite, or if it is for
            the purpose of injuring the plaintiff.  Conduct is in reckless disregard of
21          the plaintiff's rights if, under the circumstances, it reflects complete
            indifference to the plaintiff's safety or rights, or if the defendant acts in the
22          face of a perceived risk that its actions will violate the plaintiff's rights
            under federal law.  An act or omission is oppressive if the defendant
23          injures or damages or otherwise violates the rights of the plaintiff with
            unnecessary harshness or severity, such as by the misuse or abuse of
            authority or power or by the taking advantage of some weakness or
24          disability or misfortune of the plaintiff.

25  Ninth Circuit Model Civil Jury Instruction 5.5 (2007).  As set forth above, triable

26
           [22] In light of this conclusion, Defendants' argument that the County is not liable
27  because Astorga's force was reasonable is foreclosed.  *See Robinson*, 278 F.3d at 1016
    ("California . . . imposes liability on counties under the doctrine of respondeat superior
28  for acts of county employees; it grants immunity to counties only where the public
    employee would also be immune.").

1  issues of fact exist surrounding Astorga's use of force against White.  Because of

2  these unresolved issues, the Court cannot conclude as a matter of law that Astorga's

3  conduct was neither malicious, oppressive, nor in reckless disregard of White's

4  rights.  *See Abudiab v. City & Cnty. of San Francisco*, 833 F. Supp. 2d 1168, 1181

5  (N.D. Cal. 2011) *aff'd sub nom. Abudiab v. Georgopoulos*, 2013 WL 6184439, —

6  Fed. App'x — (9th Cir. Nov. 27, 2013).  The Court therefore **DENIES** summary

7  judgment as to this claim.

8                                          CONCLUSION

9          For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN**

10  **PART** Defendants' motion for summary judgment.  Accordingly, Plaintiffs may

11  proceed to trial regarding their Fourth Amendment excessive force and related state

12  law claims against Defendants Michael Astorga and County of San Diego.

13          **IT IS SO ORDERED.**

14

15  DATED:  December 12, 2014

16                                                                  Hon. Michael M. Anello
17                                                                  United States District Judge

18

19

20

21

22

23

24

25

26

27

28